# GHEEN R. ABBOTT

*vs.*

## JOHN J. HIBBITTS.

*Partnership—Evidence.*

On an issue as to the existence of a partnership between plaintiff and defendant in certain government construction work, the contract for which was made in defendant's name, but on which plaintiff worked constantly, without receiving any pay, *held* that the furnishing of money by plaintiff, to aid in financing the undertaking, was not a condition precedent to the existence of the partnership, defendant, who alone knew what was needed, never having asked plaintiff to furnish any money, and but a small amount being needed, by reason of payments made by the government as the work progressed.

*Decided November 23rd, 1922.*

Appeal from the Circuit Court No. 2 of Baltimore City (STUMP, J.).

Bill by John J. Hibbitts against Gheen R. Abbott. From an order in favor of plaintiff, defendant appeals. Affirmed.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*Isaac Lobe Straus* and *J. Paul Schmidt,* with whom was *C. R. Wattenscheidt* on the brief, for the appellant.

*Edwin T. Dickerson,* with whom was *Lindsay C. Spencer* on the brief, for the appellee.

PATTISON, J., delivered the opinion of the Court.

The appeal in this case is from an order of court, ratifying and confirming the report and account of the auditor, and ordering and decreeing that the appellant, Gheen R. Abbott, pay to the appellee, John J. Hibbitts, the sum of $4,371.62, the amount shown by the account of the auditor to be owing to the appellee by the appellant, as his share of the profits in the construction by them as partners of two gun emplacements for the United States Government on the Aberdeen Proving Grounds in the year 1920.

Whether said decree or order was properly passed depends solely upon the question whether a partnership existed between them in the construction of the emplacements.

In 1919, and prior thereto, the appellant, who was employed by the Government as advising superintendent of sewers and water lines, and the appellee, were at work at and near the Aberdeen Proving Grounds, and they occasionally met while so engaged in their work, or in going to and returning from it.

In December, 1919, the appellee suggested to the appellant that they go in the contracting business if they could raise the money therefor, to which the appellant readily assented.

Their plan, it seems, was to incorporate a company with a capital stock of $25,000, if they could interest others in its formation. To this end they called upon one or more persons to aid them financially in so doing, but were unsuccessful in their efforts, although they were told, if they were able to obtain good contracts, arrangements could be made by which they could be financed.

While the parties were still endeavoring to form the corporation, two gun emplacements were to be constructed by the Government at the proving grounds, and Hibbitts mentioned this fact to Abbott, and Abbott suggested that they file a bid with the Government for the construction of the emplacements. To this suggestion the appellee assented, and the bid was thereafter filed and accepted by the Government.

The bid and contract, however, was not made and executed in the name of Abbott and Hibbitts but in the name of G. R. Abbott and Sons.

The appellee explains why the bid was made, and the contract executed, in the name of G. R. Abbott and Sons, by saying that although he had received notice from those in authority that the work in which he was engaged would be finished on the 18th day of January, he was at that time (January 2nd) employed by the Government, and would be so employed until the 18th of January, for which reason, as he says, he told Abbott that he thought it best not to have his (Hibbitts') name appear in the bid or contract, and Abbott said, "All right," and the bid was made and the contract executed by Abbott in the name of G. R. Abbott and Sons.

The contract made by the Government for the construction of the emplacements called for unit prices, including so much per yard for excavation, and as stated by Hibbitts, "We were, at the end of the month, to give our estimate for all the work we had completed. We did not really have to wait until the first of the month. If we took out one hundred yards of excavation on the 10th of the month or on the 15th of the month we could get our money per yard, less twenty per cent., for the * * * completed work"; that "all equipment was furnished by the Government, the concrete mixer, tools, picks and shovels." The Government furnished everything that was required "with the exception of stone, cement, hydrate lime and foundation" and the sand taken out in making the excavation was used in mixing concrete, and, as stated by Hibbitts, very little capital was required to finance the job.

Hibbitts also testified that the efforts made by them to form a corporation, or to raise the quantity of money above mentioned ($25,000), were made with the view of taking care of large contracts "such as the construction of iron hangers or exhibition work"; that they made at least three bids on contracts of this class, one amounting to so much as $90,000. These were made in the name of Abbott and Hibbetts and were made during the progress of the work on the

gun emplacements, but they in each instance failed to obtain the contract, and consequently they were not required to call upon the party that had promised to finance them in the event of their getting the contracts.

The appellee testified that when the bid for the construction of the emplacements was prepared by Abbott, he brought it to him, who, at the time, was in the tool room of the Aberdeen Proving Grounds with Hugh McNeal, a young man who attended to the tools. This was on the second of January, 1920. The bid was submitted to the appellee for his inspection. It contained a charge of $2.25 a yard for excavation. Hibbitts said, "We will boost that ten cents, making it $2.35 a yard" which was done. "The concrete I left at the unit price and all the other was left at the unit price. He (Abbott) left and went up to the administration building and put in the estimate. I waited at the shop until he came down and on his return he says, 'Well, we have landed the contract, but I am sorry we did not add on $5,000 more.' I told him when he came in, it is just this, never mind, we will go along and we will make money out of the job. We have a good price."

McNeal was in the room and heard the alleged conversation between Abbott and Hibbitts, and testified that Hibbitts told Abbott to raise the price of excavation ten cents per yard, and that at the conclusion of their conversation Abbott "took the papers and went out of the shop, and when he came back he said to Hibbitts, 'We have got the job.'" When asked what else was said in the conversation he stated that Abbott said "he was sorry that he did not add $5,000 more to it," and in reply thereto Hibbitts said, "We will let it go."

The bid upon the gun emplacements and the contract executed therefor were made while they were endeavoring to incorporate a company, or at the time they were attempting to obtain assistance in financing contracts of a larger character than the one here involved, and as testified to by Hibbitts, Abbott said to him that he had worked on gun emplacements and had made about five or six thousand dollars, and that he

could finance the construction of these gun emplacements, "because I told him I had just bought a house outside of the house I was living in for investment, and if he could not, I would raise a mortgage on it. I was going to sell it * * * and he said it was not necessary, it will not be required, because we are getting our estimates." By which he meant that they would receive from time to time, as the job progressed, eighty per cent. of the amount allowed for the completed work.

Hibbitts also testified that it was agreed between him and Abbott that they should be equal partners in the transaction, that he was told "over and over" again by Abbott that he was to share in the profits, that Abbott said to him, "We will make at least from $2,500 to $3,500 out of the job."

The appellee further testified that he started to work on the job February 2nd, 1920, and worked every day thereon until April 26th, when he was taken with a cold, on account of which he was required to remain at home until the 30th of April, when he again returned to his work, but found himself unable to work. On the 11th of May he again returned to his work and asked Abbott if he could give him any help, and was told by him that he could not; that Abbott collected all the estimates and deposited the same in the bank in the name of G. R. Abbott and Sons; that after the work had progressed for some time the son came upon the job to work and, as he testified, was paid, first, thirty, and afterwards, forty dollars per week; that from the time when the son entered upon the job the conduct of Abbott, and his treatment of him, changed, causing him to suspect Abbott of unfairness and wrong dealings with him, and he asked that the money thereafter received upon the estimates be deposited in the name of himself and Abbott, but Abbott refused to do it. Hibbitts further testified that he never received any compensation for his labor, that his name was never upon the pay-roll, and that nothing was ever said to him by Abbott in regard to paying him for the work until after the rupture or break between them, when the offer to pay him $600—$200 per month for three months

—was made to him through Abbott's attorney; upon one occasion, however, Abbott, after collecting the first estimate, asked him if he needed any money, to which he said, "No, I can do without any money, as we need it in the business," and Abbott said to him "I feel the same way about it." Thereafter he was not told by Abbott when the estimates were prepared and the money received thereon, but on one occasion Abbott called upon him, saying that he was running short of money, and Hibbitts offered him a note for $2,800. This was between the 5th and 10th of April, the day on which Hibbitts had sold his house. Abbott said it is not necessary "because I will get the estimate." As stated by Hibbitts, Abbott, as he afterwards learned, had at that time received the estimate of April first, although Abbott said nothing to him about it.

It is upon the above stated evidence that Hibbitts contends that a partnership existed between him and the appellant in the construction of the gun emplacements.

The appellant, on the other hand, contends that a partnership never existed betwen them, because of the failure of the appellee to provide or furnish his part of the money to finance the transaction. Abbott testified that not only was the bid made and the contract executed in the name of G. R. Abbott and Sons, but the bond for the proper performance of the contract was likewise executed by G. R. Abbott and Sons, and the premium thereon paid by him. It was admitted, however, by Abbott, notwithstanding these facts, that Hibbitts was to share in the profits if he put up his part of the money necessary to finance the job, and this he could do after the execution of said contract, while the work was in progress, as shown by the evidence of the appellant.

This admission of Abbott narrows the scope of the inquiry to the single question whether there was an agreement between them by which the putting up of money by Hibbitts to aid in financing the job was a condition precedent to the existence of a partnership between them.

When Abbott's attention was called to the conversation with Hibbitts, testified to by the latter, at the tool shop on the day of the filing of the bid, he stated that Hibbitts asked him what the bid was and he told him; that he did not recall that the bid was raised ten cents per yard for excavation. He admitted that, after the acceptance of the bid, he returned to Hibbitts' shop, as stated by both Hibbitts and McNeal, but he denied that he said, "We have got the job," saying what he said was, "I have got the job." He admitted that he had said that he was sorry he did not add more to it, but he couldn't remember Hibbitts saying to him that "it is all right, we will make pretty good as it is," but he could not say that he (Hibbitts) did not say it.

He further stated that he told Hibbitts that the bid would be made in the name of G. R. Abbott and Sons and no request was made by Hibbitts that he should file it in any other way, nor was there anything said by Hibbitts as to any embarrassment to him in having his name in the bid or contract because of his connection with the Government. Abbott, when upon the stand, testified particularly as to the money expended by him upon the contract, but made no denial of the statement made by Hibbitts that he told him (Hibbitts) that he had five or six thousand dollars that he had made on a previous job, and that he would finance the gun emplacements, and that it would not be necessary for Hibbitts to mortgage his house to raise his part of the money required on the job, as they from time to time would receive money upon their estimates, as the work was done.

The job was started on the 2nd of February and the first payment on the work was received about the 10th of March. At that time Abbott had ordered the material and had done some excavation.

When asked: "Did you pay for them?" He answered: "Part of them. Q. What did you pay for? A. I paid some freight on some stone and paid freight on all stuff that came in. Q. Have you any idea of what the amount was you paid? A. About $700 or $800. Q. What other expense? A.

Labor. Q. H'ow much labor? A. About $900. Q. What else had you spent? A. Well I had spent some for incidentals, money for looking up labor, I suppose $50. Q. What else? A. I do not know as I recall anything else. Q. So, the $1,650 was the outside limit of the money you had to spend before you got your first payment from the Government, that is correct, isn't it? A. Yes, as well as I can tell, that is approximate."

Hibbitts testified that the first estimate, the only one shown him by Abbott, was for $2,000.

Abbott was further asked: "Q. Did you at any time * * * as testified by Hibbitts, say to him, what are you going to do in the event of a loss, what security are you going to give me? A. I asked Mr. Hibbitts if he was going to give me any security in the way of putting up any money. Q. Did he tell you at the time he would give you a note or mortgage? A. No, sir; he never told me he would give me a note. Q. Did he say, 'Do you want any legal security or in a legal way?' A. No, sir, he had a house that he was trying to sell, he always told me, on Carrollton Avenue, and when he sold that he would put that money in. Q. Did you not tell him, 'never mind, we will make a fair profit on this thing anyway?' A. I don't remember ever telling him that. Q. Will you say you never said that to him? A. I don't remember it if I did. Q. Did you never ask Mr. Hibbitts, after drawing a requisition on the Government and receiving pay for it, whether he wanted any of that money? A. I believe I did on one occasion—if he needed any money. Q. Did you during the pendency of this contract tell him that he had no interest in this contract? A. I told him that he did not have any interest in it unless he put money in it. Q. When? A. I think prior to April 26th. When we first got the contract he agreed then to put the money up. I told him then he could come in on the contract if he put the money in if there was any profit."

Abbott admitted that he was asked by Hibbitts to deposit the money he received from the estimates in their joint ac-

count and not in the name of G. R. Abbott and Sons, as he had previously done, and that he (Abbott) refused to do so. He was then asked, "And that was the cause of the disagreement? A. Well, it had been growing before that; that was when it broke."

The appellant further testified that the amount to be received on the contract for work and material furnished was $24,500, and that the amount it cost to furnish the work and material was $23,900, leaving only a profit of $600. Had Hibbitts been permitted to share equally in this profit there would have been owing to him therefrom only three hundred dollars, half of the amount Abbott offered him as compensation for his labor.

The court, however, announced that the question of profits would not be considered by him at that stage of the proceedings, that he would only consider the question whether the partnership existed, and if one were held to exist, the case would be referred to the auditor, that an account might be stated by him.

The court, at the conclusion of the whole testimony, reached the conclusion that a partnership did exist, and so decreed by its order of the 13th of May, 1921, and by such order or decree the case was referred to the auditor. The auditor, after hearing testimony, which is not before us on this appeal, filed his account, in which it appears that the appellee's share of the profits was $4,371.62. This report and account of the auditor came before the court, and was finally ratified and confirmed by its order of the 5th of January, 1922, and it is from that decree or order that this appeal is taken.

It is said in 20 R. C L. 36 that "partnership contracts, like other contracts, are governed by the intention of the parties. Every partnership rests on the mutual consent of the members. This intent may be manifested by the terms of their agreement, the conduct of the parties to each other under it, or by the circumstances generally surrounding the transaction."

This Court, in *Thillman* v. *Benton,* 82 Md. 73, said, "We take it then to be well settled that a partnership is a contract of some kind involving mutual consent of the parties, and when such a contract is entered into between two or more persons for the purpose of carrying on a trade or business, with the right to participate in the profits of such trade or business, then such a contract constitutes a partnership unless there be other facts or circumstances which show that some other relation existed."

It is conceded by the appellant that, by the agreement between them, the appellee was to be a partner in the transaction and share in the profits, if he put up his part of the money necessary to finance the job, and the evidence of the appellant warrants the conclusion that he could have done so after the execution of the contract by G. R. Abbott and Son, and while the work was in progress.

The appellant, who collected and disbursed all monies, alone knew what amount, if any, was required by the appellee in financing the transaction, and, notwithstanding this fact, it is nowhere shown in the record that the latter ever called upon the appellee for any specific sum therefor; and nowhere in the record is it shown that any amount was named or agreed upon by them that should be paid by the appellee.

The appellee, who had worked constantly upon the job for three months, was never paid therefor, nor was he upon the payroll, although all others who worked thereon, excepting Abbott, were upon it; and during this whole period the appellant never intimated to the appellee that he would be compensated for his work otherwise than by receiving a share of the profits, and it was not until after the breach or rupture between them, in the latter part of April, when the work was near completion, that any offer was made the appellee to pay. him for his work. The offer was then made by Abbott, through his attorney, to pay to appellee $200 per month for three months. At this time, it may reasonably be inferred from the evidence, the appellant had been fully reimbursed

from the collections made by him for all monies that he had advanced upon the job.

The provisions of the contract permitting the property of the Government, and the sand taken from the excavations, to be used upon the job without charge therefor, and the payments at short intervals for the work done, made it unnecessary to advance more than a comparatively small amount of money to finance the transaction. It was because of these facts, as stated by the appellee, that the appellant agreed to advance the sum necessary in the progress of the work, when told by the appellee that he had no money to aid in the financing of it, assigning as his reasons therefor that he had recently bought a house as an investment and to raise the money he would have to mortgage it.

This statement of the appellee, which is said by him to have been the agreement between him and the appellant as to how and by whom the job was to be financed, is in our opinion supported by the facts and circumstances in the case, including the acts and conduct of the parties to which reference has been made; consequently the court below was, we think, warranted in its conclusion, upon the evidence before it, that a partnership existed between the appellant and appellee in the construction of the gun emplacements, entitling the plaintiff to a share of the profits therein.

We will, therefore, affirm the order appealed from.

*Order affirmed, with costs to the appellee.*