954 A.2d 1092

**Thomas L. CLANCY, Jr.**

v.

**Wanda T. KING.**

No. 112 Sept. Term, 2007.

Court of Appeals of Maryland.

Aug. 26, 2008.

Rachel T. McGuckian (J. Stephen McAuliffe, III of Miles & Stockbridge, P.C., Rockville, MD; Lowell R. Bowen of Miles & Stockbridge, P.C., Towson, MD), on brief, for Petitioner.

Jerrold A. Thrope (Sheila K. Sachs and Valerie L. Albrecht of Gordon, Feinblatt, Rothman, Hoffberger & Hollander, L.L.C., Baltimore, MD), on brief, for Respondent.

Argued Before BELL, C.J., RAKER,\* HARRELL, BATTAGLIA, GREENE, MURPHY and DALE R. CATHELL (Retired, specially assigned), JJ.

HARRELL, Judge.

On 26 February 1992, Thomas L. Clancy, Jr, perhaps best known as the author of many popular "techno-thriller" novels, and Wanda King,[1] his wife at the time, entered into an agreement (the "JRLP Partnership Agreement"), under Maryland law, forming the Jack Ryan Limited Partnership (JRLP). The purpose, as later amended, of JRLP is to "engage in activities relating to the writing, publishing and sale of books or in any other lawful activity . . . ." Clancy and King each own a 1% general partnership interest and 49% limited partnership interest in JRLP. Section 5.5 of the 33 page JRLP Partnership Agreement states in pertinent part:

---

\* Raker, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, she also participated in the decision and adoption of this opinion.

1. At the time of the execution of the agreement, King was known as Wanda Clancy. The couple resided in Calvert County, Maryland, during their marriage and at the time of execution of the agreement.

A The General Partners or their Affiliated Persons may act as general or managing partners for other partnerships engaged in businesses similar to that conducted by the Partnership. Nothing herein shall limit the General Partners or their Affiliated Persons from engaging in any such business activities, or any other activities which may be competitive with the Partnership or the [JRLP-owned] Property, and the General Partners or their Affiliated Persons shall not incur any obligation, fiduciary or otherwise, to disclose or offer any interest in such activities to any party hereto and shall not be deemed to have a conflict of interest because of such activities.....

E. The General Partners shall be under a fiduciary duty to conduct the affairs of the Partnership in the best interests of the Partnership, including the safekeeping and use of all Partnership funds and assets and the use thereof for the benefit of the Partnership. The General Partners shall at all times act in good faith and exercise due diligence in all activities relating to the conduct of the business of the Partnership.

Section 5.7 of the JRLP Partnership Agreement provides that:

Neither the Partnership nor any Partner shall have any rights or obligations, by virtue of this Agreement, in or to any independent ventures of any nature or description, or the income or profits derived therefrom, in which a Partner may engage, including, without limitation, the ownership, operation, management, syndication and development of other businesses, even if in competition with the Partnership's trade or business.

JRLP, in furtherance of its purpose, contracted with S & R Literary, Inc., in a 23 March 1993 letter agreement, forming a joint venture known as "Tom Clancy's Op–Center" (Op–Center).[2] S & R Literary is controlled by its President, Dr. Steve

---

**2.** Paragraph nine of the letter agreement states that the joint venture agreement shall be "governed by the law of the State of New York." This does not impact our analysis here. King claims that Clancy breached his fiduciary duty to her and JRLP. The principal agreement

R. Pieczenik. The original purpose of the Joint Venture Agreement was to develop a proposal for a television series.[3] Proceeds from the efforts undertaken pursuant to the Op–Center joint venture were to be split evenly between JRLP and S & R Literary. The Op–Center Joint Venture Agreement pertinently states:

> 2. All decisions with respect to the development, use and exploitation of the proposal shall be made by mutual agreement between Steve R. Pieczenik and Tom Clancy; provided, however, that if, after discussion, no agreement is reached, the decision of Tom Clancy should prevail.

The signature page of the Joint Venture Agreement appears as follows:

> If the foregoing is in accordance with your understanding, please indicate your agreement by signing and returning copies hereof to us.
>
> Very truly yours,
>
> JACK RYAN LIMITED PARTNERSHIP By [Mr. Clancy]
>
> AGREED TO AND ACCEPTED:
>
> S. & R. LITERARY, INC. By [Dr. Pieczenik]
>
> AGREED TO (insofar as I am concerned):
>
> [Mr. Clancy]
>
> [Dr. Pieczenik]

To develop the paperback book series, Pieczenik assembled a team including Martin Greenberg, a book "packager,"[4] and

---

governing that relationship, the JRLP Partnership Agreement, is governed by Maryland law. Furthermore, for reasons that we shall explain later in this opinion, New York law is in accord with Maryland law on the specific legal issues governing this case.

**3.** The television miniseries aired on NBC; however, the network declined to continue the series thereafter. The scope of the Op–Center franchise was expanded to paperback books by letter agreements dated 11 September 1994 and 26 September 1994. Each letter "ratified and confirmed" the terms of the Joint Venture Agreement.

**4.** It is our understanding that a book packager is a person, outside of a publishing company, that coordinates the various tasks required to

Jeff Rovin, an author-for-hire. Rovin was selected as the actual author of the series because, it was thought, he would be able to affect a "Clancyesque" style of writing. According to the testimony, Clancy had very little to do with the development of the series. Although he "glanced at a few" of the books, Clancy did not read, cover-to-cover or in any meaningful part, any of the books in the series. Apparently his chief contribution to the effort was the aura lent to the enterprise by the association of his name and reputation.

The Op–Center paperback books proved to be successful. Every book appeared on the New York Times Paperback Bestseller list. As of July 2003, the Op–Center book series generated over $28 million in domestic and foreign profits, after deducting writers' fees, commissions, and other expenses.

In 1996, in the midst of the Op–Center series of books, Clancy and King, as husband and wife, separated. Their divorce was finalized by the Circuit Court for Calvert County on 6 January 1999. Leading up to the divorce, Clancy and King entered into a Marital Property Agreement.[5] Although the Marital Property Agreement did not alter the respective ownership interests of Clancy and King in JRLP, it designated Clancy as Managing Partner of JRLP.[6] The Marital Prop-

---

publish a book, including editing, fact-checking, and designing the book. Wikipedia, Book Packaging, http://en.wikipedia.org/wiki/Book_ packager (last visited 16 June 2008).

**5.** The Marital Property Agreement was "incorporated but not merged" into the divorce decree.

**6.** The Marital Property Agreement provided, in pertinent part:

Husband and Wife are the only and equal partners in Jack Ryan Limited Partnership, a Maryland limited partnership ("JRLP"), each owning a 1% general partner interest and a 49% limited partner interest. . . . Husband shall act as the managing partner of JRLP and as such shall have the usual powers of a managing partner to negotiate and sign on behalf of the Partnership royalty and other contracts for the exploitation of JRLP's literary assets [including the Op–Center Joint Venture], such power not to be exercised in a manner inconsistent with this Agreement. However, approval of Husband and Wife shall be required for: (1) any contract for the

erty Agreement also contained a provision by which a party breaching the agreement would have to pay the non-breaching party's resultant costs.[7]

After a total of 10 books were published in the Op–Center series, and Books 11 and 12 slated for publication, Clancy set the stage for the possible removal of his name from the Op–Center series. JRLP and S & R Literary agreed, in a jointly signed letter dated 23 October 2001, that Clancy's name would be used in connection with Books 13 and 14 in the series. Clancy signed on behalf of JRLP; Pieczenik on behalf of S & R Literary. The letter agreement provided further that, after the publication of Book 14, JRLP could withdraw permission to use Clancy's name in connection with future books in the series.[8]

King filed a Complaint in the Circuit Court for Calvert County on 3 July 2003 alleging that Clancy breached his fiduciary duty to her and JRLP by, *inter alia*, stating[9] that he intended to prevent the use of his name in connection with later books in the Op–Center series. She sought injunctive relief to prohibit Clancy, as Managing Partner of JRLP, from taking action detrimental to the Op–Center series, an order

------

licensing or sale of motion picture rights, (2) any contract between JRLP and Husband or Wife, or between JRLP and any entity in which Husband or Wife has a direct or indirect interest, and (3) any contract pursuant to which Husband or Wife would receive benefit other than as a partner of JRLP.

7. Specifically, the Marital Property Agreement stated:
 Each party shall indemnify and hold the other harmless from all damages, liabilities, losses, costs, fees and expenses (including attorneys and accountants fees and expenses) resulting from such party's breach of this Agreement, including any amounts incurred in the enforcement of this Agreement.

8. If JRLP exercised its option to withdraw Clancy's name, the profit sharing arrangement under the Op–Center Joint Venture Agreement would be altered. Instead of a 50–50 split, 75% of the profits from the series would belong to S & R Literary. Thus, JRLP's share would be reduced to 25% of the profits.

9. Clancy admitted making such statements in his answer to King's complaint.

placing her in the role of Managing Partner of JRLP, and recovery of attorneys' fees and expenses.

It was not until 19 January 2004 that Clancy "pulled the trigger" on his announced intent to withdraw his name prospectively from the Op–Center series. Through counsel in a 19 January 2004 letter, he expressed his refusal to permit the Op–Center joint venture to use his name in connection with the series beyond Book 14. Specifically, the letter stated:

Although [Clancy], individually, permitted the joint venture to use the name "Tom Clancy" in the series title in connection with op-Center paperback books 1 through 14, he has withdrawn permission to the joint venture for further and future use of his name in the titles to the Op–Center paperback book series beyond book 14. Please accept this letter as confirmation of the fact that [Clancy] will not permit the joint venture to use his name in the title to the Op–Center paperback book series beyond book 14.

On 20 January 2004, Clancy filed in the case initiated by King a Counterclaim for Declaratory Relief. Clancy sought a declaration holding:

(1) That beyond rights granted by [him] to the Joint Venture to use the "Tom Clancy" name in the publication of Books 1 through 14 of the Op–Center paperback book series, the Joint Venture does not possess the right to use the name "Tom Clancy" in the Op–Center series title;

(2) That the Joint Venture does not have the right to use the name "Tom Clancy" in the series title for hardback book publications;

(3) That all decisions with respect to the development, use and exploitation of the Op Center concept are at the unfettered discretion of [Clancy], individually;

(4) That [Clancy] may withhold or withdraw any license to use his name in Joint Venture business endeavors for any reason, including for purely personal competitive reasons;

(5) That JRLP does not possess the right to use the name "Tom Clancy";

 (6) That Wanda King does not possess the right to use the name "Tom Clancy"; [and]

 (7) That [Clancy] does not owe a duty, as managing partner or otherwise, to JRLP such as would require him to permit the use of his name in JRLP's business ventures, including through its participation in the Joint Venture.

Clancy later filed a motion for summary judgment.[10] King responded with a motion for partial summary judgment.[11] In denying Clancy's motion and granting King's, the trial court held that Clancy does not "individually own or control the mark 'Tom Clancy's Op–Center'" and that Clancy's "partnership and/or contractual obligations to Ms. King preclude him from stopping the future use of the mark 'Tom Clancy's Op–Center.'" The trial court ordered that the case proceed to trial on the issues of "the extent of equitable relief" to be granted to King and King's "request to recover her legal fees."

In consideration of arguments made on the first day of trial, the trial court vacated its summary judgment ruling in King's favor to the extent that it held that Clancy breached his fiduciary duty to JRLP and King.[12] That issue also proceeded to trial.

The Circuit Court bifurcated the trial. The object of the first portion of the trial was to determine whether Clancy

---

**10.** Clancy requested that the Circuit Court grant summary judgment in his favor on both King's original complaint and his counterclaim for declaratory relief.

**11.** King sought summary judgment on all issues except her request for equitable relief and her request to recover attorneys' fees.

**12.** The trial court noted:

> The Court is going to stand by its ruling with regard to the judgment in favor of Ms. King on Mr. Clancy's counterclaim for declaratory relief and the ruling that it does not individually own or control the mark Tom Clancy's Op–Center. However, I feel bound to reverse my ruling with regard to the contractual obligations. This is a motion for summary judgment, and ruling as a matter of law that Mr. Clancy's obligation to Ms. King precludes him from stopping the future use of the mark Tom Clancy's Op–Center I think will depend

breached his fiduciary duty to JRLP and King. The second part of the trial was to determine, if necessary, equitable relief and damages due to King. On 5 August 2005, the Circuit Court concluded that Clancy breached his duty to JRLP and the Op–Center joint venture. The court ordered that King be appointed as managing partner of JRLP as it related to the Op–Center series, which included "collaborating and negotiating with Dr. Pieczenik, on behalf of the joint venture, publishing, royalty and other contracts for the management of the Op–Center brand." A later order awarded King attorneys' fees and expenses in the amount of $518,431.71.

Clancy noted a timely appeal to the Court of Special Appeals. The intermediate appellate court affirmed, in an unreported opinion, the Circuit Court's judgment. The Court of Special Appeals, however, expressed its view that the scope of the trial court's order as to King's authority as managing partner of JRLP with regard to the Op–Center project was not sufficiently clear. The court remanded the case to the Circuit Court for clarification.

We granted Clancy's Petition for Writ of Certiorari, 402 Md. 355, 936 A.2d 852 (2007), to consider three questions:

1. Whether the lower courts erred in failing to recognize that principles of contract preempt fiduciary duties where the contract is unambiguous and the parties have made their intentions clear?

2. Whether the intermediate appellate court erred by failing to order that under [King's] control the Op–Center Joint venture cannot expand its activities beyond its current scope, which is television productions and mass market paperback books?

3. Whether the lower courts erred in awarding attorneys' fees and expenses to the respondent?

---

on a factual determination as to whether in fact that is an appropriate business decision on behalf of the Jack Ryan Limited Partnership, as opposed to whether it is a decision that sits in and of itself only for that asset and not for the other assets that that partnership owns. So we can take testimony with regard to that issue, and that issue alone.

## Discussion

Where, as in the present case, an action has been tried without a jury, we "review the case on both the law and the evidence." Maryland Rule 8–131(c). "We will not disturb the judgment on the facts, however, unless the trial court's findings are clearly erroneous." *Goff v. State,* 387 Md. 327, 338, 875 A.2d 132, 139 (2005). "The deference shown to the trial court's factual findings under the clearly erroneous standard does not, of course, apply to legal conclusions." *Nesbit v. Gov't Employees Ins. Co.,* 382 Md. 65, 72, 854 A.2d 879, 883 (2004). Where a case involves "the application of Maryland statutory and case law, our Court must determine whether the lower court's conclusions are 'legally correct' under a de novo standard of review." *Walter v. Gunter,* 367 Md. 386, 392, 788 A.2d 609, 612 (2002).

Clancy concedes that, contract law aside,[13] his pertinent actions, which animated King's suit, would violate the fiduciary duty he owed to JRLP. Thus, for proper analysis of the controversy presented for our review involving the interpretation of the JRLP Partnership Agreement and the Op–Center

---

**13.** A limited partnership is essentially a creature of contract or a series of contracts. *See* Maryland Code (1975, 2007 Repl. Vol.), Corporations & Associations Article, § 9A–103(a) ("[R]elations among the partners and between the partners and the partnership are governed by the partnership agreement."); *id.* § 10–403 ("Except as provided in this title *or in the partnership agreement,* a general partner of a limited partnership has the rights and powers and is subject to the restrictions and liabilities of a partner in a partnership." (emphasis added)); *Sonet v. Timber Co., L.P.,* 722 A.2d 319, 322 (Del.Ch.1998) ("Thus, I think it a correct statement of law that principles of contract preempt fiduciary principles where the parties to a limited partnership have made their intentions to do so plain."); *Cont'l Ins. Co. v. Rutledge & Co., Inc.,* 750 A.2d 1219, 1235 (Del.Ch.2000) ("Where a contract clause amends the fiduciary duties a general partner owes the limited partners, a court will give full force to the terms of the contract."); ALAN R. BROMBERG & LARRY E. RIBSTEIN, BROMBERG & RIBSTEIN ON PARTNERSHIP § 12:05(d) (1988, Rel. 2002–2) ("The [limited partnership] agreement has always been the principal determinant of the relations among partners."); Larry E. Ribstein, *Fiduciary Duties and Limited Partnership Agreements,* 37 SUF-FOLK U.L. REV. 927, 965 (2004) ("Fiduciary duties in business associations should be regarded as default rules that work together with, and can be displaced by, explicit provisions of the contract."); Larry E.

Joint Venture Agreement, we need not dwell unduly on common law or statutory fiduciary duties.[14]

■■■ Section 9A–103(a) of the Maryland Code, Corporations and Associations Article notes that "relations among the partners and between the partners and the partnership are governed by the partnership agreement." Section 9A–103(b)(3)(i) permits partnerships to "identify specific types or categories of activities that do not violate the duty of loyalty."[15] "The general rule is that the partnership agreement governs the relations among the partners and between the partners and the partnership." *Della Ratta v. Larkin*, 382 Md. 553, 564, 856 A.2d 643, 649 (2004) (citing *Creel v. Lilly*, 354 Md. 77, 87, 729 A.2d 385, 391 (1999)). "A partnership is,

---

Ribstein, *An Applied Theory of Limited Partnership*, 37 EMORY L.J. 835, 838 (1988) (noting that the author views "the limited partnership as a form of contract"); UNIF. LTD. P'SHIP ACT (2001) § 201 cmt. ("A limited partnership is a creature of contract as well as a creature of statute.").

**14.** The present case is analogous to cases involving traditional partnerships and corporations. Therefore, it is helpful to turn to cases in those contexts to analyze the legal issues here. *See Klein v. Weiss*, 284 Md. 36, 59, 395 A.2d 126, 139 (1978) ("The relationship between the general and limited partner is a fiduciary one—a relation of trust—similar to that existing between a corporate director and a shareholder."); *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 714 A.2d 96, 99–100 (Del.Ch.1998) (using corporate and traditional partnership precedents to analyze limited partnerships); *Kahn v. Icahn*, No. Civ. A. 15916, 1998 WL 832629, *1 n. 2, 24 Del. J. Corp. L. 738, (Del.Ch.1998) *summarily aff'd*, 746 A.2d 276 (Del.2000) (same); *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 973 (2d Cir.1989) (noting that general partners are held to the same fiduciary standard owed by corporate directors).

The fact that the present case deals with a limited partnership rather than a corporation provides even greater reason to defer to the provisions of the various contracts. Limited partnership agreements are more likely to be the result of extensive arm's-length negotiations and thus involve business venturers in a better position to bargain for various terms modifying fiduciary duties than the purchasers of mere stock in a corporation, especially a publicly-traded one. Larry E. Ribstein, *Unlimited Contracting in the Delaware Limited Partnership and its Implications for Corporate Law*, 16 J. CORP. L. 299, 305 (1991).

**15.** Section 9A–103 is applicable to limited partnerships, as well as general partnerships. Maryland Code (1975, 2007 Repl. Vol.), Corporations & Associations Article, § 10–108.

of course, a contractual relation to which the principles of contract law are fully applicable." *Klein v. Weiss,* 284 Md. 36, 63, 395 A.2d 126, 141 (1978) (citing *Collier v. Collier,* 182 Md. 82, 32 A.2d 469 (1943) and *Abbott v. Hibbitts,* 142 Md. 7, 119 A. 650 (1922)); *see also Della Ratta,* 382 Md. at 569, 856 A.2d at 652–53 (holding that the limited partnership agreement modified the default rules governing the limited partnership); J. William Callison, *Why a Fiduciary Duty Shift to Creditors of Insolvent Business Entities Is Incorrect as a Matter of Theory and Practice,* 1 J. BUS. & TECH. L. 431, 451–52 (2007) ("[T]he business organization universe is full of other forms, specifically closely held corporations, limited partnerships, and limited liability companies, in which the emerging consensus is that fiduciary duties are capable of modification by agreement."); ALAN R. BROMBERG & LARRY E. RIBSTEIN, BROMBERG & RIBSTEIN ON PARTNERSHIP § 12:05(e) (1988, Rel. 2002–2) ("Within very broad limits the [limited partnership] agreement may be anything the partners want it to be."). King concedes that "[a] partner's fiduciary duties may be modified by partnership agreement." Appellee's Brief at 15.

Thus, the first step in the proper analysis of the questions presented by the instant case is to examine the contracts governing the operation of JRLP and the Op–Center Joint Venture. *See Sonet v. Timber Co.,* 722 A.2d 319, 324 (Del.Ch. 1998) (noting that under limited partnership law "a claim of breach of fiduciary duty must first be analyzed in terms of the operative governing instrument—the partnership agreement—and only where that document is silent or ambiguous, or where principles of equity are implicated, will a Court begin to look for guidance from the statutory default rules, or other extrinsic evidence"); Stephen M. Bainbridge, *Much Ado About Little? Directors' Fiduciary Duties in the Vicinity of Insolvency,* 1 J. BUS. & TECH. L. 335, 337 (2007) ("[F]iduciary duties ... can be understood as gap-fillers that complete the contract....").

 The rules of contract interpretation are well-settled. "The interpretation of a contract, including the determination of whether a contract is ambiguous, is a question of law,

subject to de novo review." *Sy–Lene of Wash., Inc. v. Starwood Urban Retail II, LLC,* 376 Md. 157, 163, 829 A.2d 540, 544 (2003). "Maryland adheres to the principle of the objective interpretation of contracts." *Cochran v. Norkunas,* 398 Md. 1, 16, 919 A.2d 700, 710 (2007). The court will " 'giv[e] effect to the clear terms of the contract regardless of what the parties to the contract may have believed those terms to mean.' " *United Servs. Auto. Ass'n v. Riley,* 393 Md. 55, 79, 899 A.2d 819, 833 (2006) (quoting *Towson Univ. v. Conte,* 384 Md. 68, 78, 862 A.2d 941, 946–47 (2004)). "Thus, our search to determine the meaning of a contract is focused on the four corners of the agreement." *Cochran,* 398 Md. at 17, 919 A.2d at 710 (citing *Walton v. Mariner Health,* 391 Md. 643, 660, 894 A.2d 584, 594 (2006)). "[E]ffect must be given to each clause so that a court will not find an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed." *Sagner v. Glenangus Farms, Inc.,* 234 Md. 156, 167, 198 A.2d 277, 283 (1964).

 There are essentially two contracts of concern in the present case.[16] The first, the JRLP Partnership Agreement, clearly and unambiguously limits the duty of loyalty ordinarily owed by Clancy to JRLP and King. Section 5.5A of the JRLP Partnership Agreement pertinently states:

The General Partners or their Affiliated Persons may act as general or managing partners for other partnerships engaged in businesses similar to that conducted by the Partnership. Nothing herein shall limit the General Partners or their Affiliated Persons from engaging in any such business activities, or any other activities which may be competitive with the Partnership or the [JRLP-owned] Property, and the General Partners or their Affiliated Persons shall not

---

**16.** Although the original Joint Venture Agreement was extended to include the Op–Center book series, the agreement to expand the joint venture "ratified and confirmed" the terms of the original Joint Venture Agreement. Similarly, the Marital Settlement Agreement in the separate divorce case between Clancy and King did not alter the terms of the JRLP Partnership Agreement.

incur any obligation, fiduciary or otherwise, to disclose or offer any interest in such activities to any party hereto and shall not be deemed to have a conflict of interest because of such activities.

Similarly, § 5.7 of the JRLP Partnership Agreement provides that:

Neither the Partnership nor any Partner shall have any rights or obligations, by virtue of this Agreement, in or to any independent ventures of any nature or description, or the income or profits derived therefrom, in which a Partner may engage, including, without limitation, the ownership, operation, management, syndication and development of other businesses, even if in competition with the Partnership's trade or business.

In short, these provisions trumped the usual duty not to compete with the limited partnership and, to a large extent, the duty not to usurp partnership opportunities. *See Kahn v. Icahn,* No. Civ. A. 15916, 1998 WL 832629, *3, 24 DEL. J. CORP. L. 738 (Del.Ch.1998), *aff'd,* 746 A.2d 276 (Del.2000) (table) [17] (holding that contract language almost identical to the language in the JRLP Partnership Agreement permitted the general partner to compete with the firm and usurp the firm's business opportunities); Andrew S. Gold, *On the Elimination of Fiduciary Duties: A Theory of Good Faith for Unincorporated Firms,* 41 WAKE FOREST L.REV. 123, 127–28 (2006) ("Typically, when fiduciary duties are eliminated, the scope of managerial discretion will be limited by the parties (or, in cases of contractual silence, provided by default terms). But barring egregious cases, such as unconscionability, fraud, or

---

**17.** Although the citation of unreported opinions (Maryland or otherwise) ordinarily is not appropriate, this is an unusual situation. *Kahn* has been cited by the Maryland Court of Special Appeals. *Alloy v. Wills Family Trust,* 179 Md.App. 255, 287 n. 16, 944 A.2d 1234, 1253 n. 16 (2008). Delaware courts have described *Kahn* as a "well-reasoned decision." *R.S.M. Inc. v. Alliance Capital Mgmt. Holdings L.P.,* 790 A.2d 478, 497 n. 25 (Del.Ch.2001), a view with which we agree. In view of that, and the paucity of homegrown Maryland cases in this area, we choose to include *Kahn* here for its persuasive analysis and sound result.

misappropriation of assets, contract doctrine mandates few restrictions...."); J. WILLIAM CALLISON & MAUREEN A. SULLIVAN, PARTNERSHIP LAW & PRACTICE: GENERAL & LIMITED PARTNERSHIPS § 22:8 (2007) (recommending sample language similar to that in the JRLP Partnership Agreement to permit the general partner to engage in self-dealing and competition with the limited partnership).[18]

Thus, Clancy was under no obligation to allow JRLP to participate in the Op–Center Joint Venture. Clancy was free to retain all profits and management of the Op–Center Joint Venture for himself as an individual.[19]

 As to the second contract of special relevance in the present case, the Op–Center Joint Venture Agreement, states:

2. All decisions with respect to the development, use and exploitation of the proposal shall be made by mutual agreement between Steve R. Pieczenik and Tom Clancy; provided, however, that if, after discussion, no agreement is reached, the decision of Tom Clancy should prevail.

---

**18.** Cases from other jurisdictions firmly establish that fiduciaries and those to whom they owe such duties, by contract, may permit actions that otherwise would be flagrant violations of common law and statutory fiduciary duties. *Jerman v. O'Leary*, 145 Ariz. 397, 701 P.2d 1205, 1210 (Ct.App.1985) (holding that the general partner in a limited partnership was authorized by the partnership agreement to purchase the partnership's land at market value, without the consent of the limited partners); *Westminster Props., Inc. v. Atlanta Assocs.*, 250 Ga. 841, 301 S.E.2d 636, 638 (1983) (holding that the general partner may foreclose on partnership property for unpaid debt, over the objection of the limited partners, as specified in the partnership agreement); *Carella v. Scholet*, 5 A.D.3d 972, 773 N.Y.S.2d 763, 765 (2004) (holding that the limited partnership agreement authorized the general partner to sell, at far below market price, partnership property to the general partner's son, without consent of the limited partners).

**19.** This is evidenced further by the variety of other ventures with which Clancy is involved and in which JRLP has no interest, such as the *Tom Clancy's Splinter Cell* books and video game line and *Tom Clancy's Net Force*. King was aware of these other ventures at the time that she signed the JRLP Partnership Agreement. King, as least at the time of her divorce from Clancy, maintained a 40% interest and served as a director of a competing venture, Jack Ryan Enterprises, Ltd.

In other words, "Tom Clancy" has final authority over "[a]ll decisions" regarding the "development, use, and exploitation" of the Op–Center project.[20] The Joint Venture Agreement is between two parties, JRLP and S & R Literary, but also was signed by Clancy and Pieczenik individually. The face of the contract makes clear the dual capacities of the various signatories.

The contract is in the form of a letter from JRLP to S & R Literary. Thus, where the contract refers to "you," it refers to S & R Literary.[21] By contrast, when the contract uses the third person plural "we" or "ours," the contract refers to JRLP.[22] The use of the name "Tom Clancy" in paragraph two

---

**20.** As foretold in footnote 2, *supra,* New York law is in accord with Maryland law on the specific issues governing this case. Under New York law, partners and joint venturers owe each other fiduciary duties. *Meinhard v. Salmon,* 249 N.Y. 458, 164 N.E. 545, 546 (1928). Partners may alter those duties, even to permit self-dealing, by including in the partnership agreement "any agreement they wish." *Riviera Congress Assocs. v. Yassky,* 18 N.Y.2d 540, 277 N.Y.S.2d 386, 223 N.E.2d 876, 880 (1966). All contracts, including partnership agreements, are subject to the implied covenant of good faith and fair dealing. *Id.; Gelder Med. Group v. Webber,* 41 N.Y.2d 680, 394 N.Y.S.2d 867, 363 N.E.2d 573, 577 (1977); *AFBT–II, LLC. v. Country Vill. on Mooney Pond, Inc.,* 305 A.D.2d 340, 759 N.Y.S.2d 149, 151 (2003); *Stuart v. Lane & Mittendorf,* 235 A.D.2d 294, 652 N.Y.S.2d 951 (N.Y.App.Div.1997). "[I]n every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing." *Kirke La Shelle Co. v. Paul Armstrong Co.,* 263 N.Y. 79, 188 N.E. 163, 167 (1933). "Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion...." *Dalton v. Educ. Testing Serv.,* 87 N.Y.2d 384, 639 N.Y.S.2d 977, 663 N.E.2d 289, 291 (1995).

**21.** For example, paragraph one states that "[y]ou agree to furnish the services of Steve R. Pieczenik...." "You" clearly refers to S & R Literary. If it referred to Pieczenik individually, it would be nonsensical.

**22.** Paragraph five states that "[c]opyright in the proposal shall be held jointly in your name and ours." The Op–Center trademark application in the record was submitted jointly by JRLP and S & R Literary.

means "Tom Clancy individually." To read "Tom Clancy" in paragraph two to mean "Tom Clancy, as General Partner of JRLP" defies plain meaning and would cause the terms in paragraph two to conflict with the terms in paragraph four. Paragraph four states that "equal credit [shall] be given to Tom Clancy and Steve Pieczenik (in that order) as originators of the series." In this respect, paragraph four also used "Tom Clancy" to mean Clancy individually, not in his role as general partner of JRLP. Finally, the signature page clearly contemplates that Clancy signed the contract both as General Partner of JRLP and as an individual. The signature page appears as follows:

> If the foregoing is in accordance with your understanding, please indicate your agreement by signing and returning copies hereof to us.
>
> Very truly yours,
>
> JACK RYAN LIMITED PARTNERSHIP By [Mr. Clancy]
>
> AGREED TO AND ACCEPTED:
>
> S. & R. LITERARY, INC. By [Dr. Pieczenik]
>
> AGREED TO (insofar as I am concerned):
>
> [Mr. Clancy]
>
> [Dr. Pieczenik]

There would be no reason for Clancy's and Pieczenik's signatures to appear twice on the signature page unless they also were signing in their individual capacities. JRLP and S & R Literary already and objectively had indicated their intent to be bound by the contract as evidenced by the signatures earlier on the page. The phrase "AGREED TO (insofar as I am concerned)" also indicates that Clancy signed individually. Throughout the contract, JRLP is referred to in the first person plural as "we" or "us." The use of the word "I" shows that those signatures were of individuals.[23] The

---

23. In fact, the additional signatures of Clancy and Pieczenik were necessary to complete the contract. Paragraphs one and two impose duties on both Clancy and Pieczenik. The two must discuss and

Circuit Court and the Court of Special Appeals correctly recognized that Clancy reserved for himself, individually, in the Op–Center Joint Venture Agreement, management and control of the Op–Center venture.

If traditional common law and statutory fiduciary duty principles were paramount to the analysis and outcome of the present case in the posture in which it reaches us, portions of this contract clearly would be improper self-dealing and a usurpation of a partnership opportunity. Clancy reserved control of the project to himself, not the entity to which he owed fiduciary duties. Instead, the JRLP Partnership Agreement clearly contemplates that Clancy may compete with JRLP. In fact, Clancy, under the JRLP Partnership Agreement, may contract to control individually the entire management and profits of the Op–Center Joint Venture. There is no reason, therefore, that he could not contract for less of an interest in the Op–Center activities for himself individually. In essence, Clancy agreed to retain full and final management authority for himself individually, while assigning the profits and ownership of the venture to JRLP. Thus, the terms of the Op–Center Joint Venture contract were permitted by the terms of the JRLP Partnership Agreement.

A fiduciary, under appropriate circumstances, may acquire and enforce legal rights against the firm for which he or she serves as a fiduciary. In *Waterfall Farm Systems, Inc. v. Craig*, 914 F.Supp. 1213, 1215 (D.Md.1995), the Craigs,

---

attempt to agree on decisions regarding the development of Op–Center. If either Clancy or Pieczenik failed to perform those duties, either JRLP or S & R, respectively, would be in breach of contract. The non-breaching entity would be able to sue the other for breach of the agreement (and the breaching entity would be able to seek recovery from its fiduciary for a breach of fiduciary duty).

If Clancy and Pieczenik were not signatories individually, the non-breaching entity would not be able to recover directly from the individuals for their failure to perform. This illustrates one of the purposes of limited liability entities such as the closely-held corporation, limited partnership, and limited liability company. Much of the motivation behind forming such a business entity is to shield the individual from the liabilities of the business entity.

minority shareholders and directors of a corporation, owned real property upon which a greenhouse was built. The property was leased to the corporation but the lease agreement was never finalized in writing. *Waterfall Farm Sys.*, 914 F.Supp. at 1223. After the corporation failed to pay rent, the Craigs attempted to terminate the lease. *Waterfall Farm Sys.*, 914 F.Supp. at 1219. The corporation filed suit, arguing that the Craigs breached their fiduciary duty to the corporation. *Waterfall Farm Sys.*, 914 F.Supp. at 1220–21. The court held that where the Craigs' interests were adverse to that of the corporation as lessors, "they had every right to take proper and lawful steps to protect the substantial investment which they had in the real property owned by them," even if those steps would have an adverse financial consequence on the corporation. *Waterfall Farm Sys.*, 914 F.Supp. at 1228.

In *Storetrax.com, Inc. v. Gurland*, 397 Md. 37, 45, 915 A.2d 991, 996 (2007), a director brought a breach of contract action against the corporation seeking payment of a severance package. He obtained a default judgment against the corporation and enforced the judgment by attaching the corporation's bank account. *Storetrax.com*, 397 Md. at 46, 915 A.2d at 996. The director refused to voluntarily relinquish the default judgment upon the corporation's request. *Storetrax.com*, 397 Md. at 47, 915 A.2d at 996. The corporation sued, arguing that the director breached his fiduciary duty to the corporation. *Storetrax.com*, 397 Md. at 47–48, 915 A.2d at 997. We held that the director did not breach his fiduciary duty by obtaining a judgment against the corporation and enforcing a writ of garnishment against the corporate bank account. *Storetrax.com*, 397 Md. at 67, 915 A.2d at 1009. *Waterfall Farm Systems* and *Storetrax.com* stand for the proposition that a fiduciary properly may enforce a validly obtained legal right against the firm to which he or she stands in a fiduciary relationship.

Similarly, in *Manufacturers Trust Co. v. Becker*, 338 U.S. 304, 308, 70 S.Ct. 127, 130, 94 L.Ed. 107 (1949), fiduciaries and their family members purchased, at arm's length from third

parties but at a tremendous discount from their face value, notes of the corporation in which they served as directors. Another creditor sued to stop the payment of the notes. *Mfrs. Trust*, 338 U.S. at 305–06, 70 S.Ct. at 128–29, 94 L.Ed. 107. The creditor argued that notes held by the fiduciaries should be paid, if at all, only up to the amount that the fiduciaries paid for them on the open market. *Id.* The Supreme Court held that fiduciaries could recover more than the amount they paid to acquire the notes. *Mfrs. Trust*, 338 U.S. at 314–15, 70 S.Ct. at 133, 94 L.Ed. 107.

■ *Manufacturers Trust* stands for the proposition that where there is "no component of unfair dealing or bad faith," fiduciaries may recover beyond their personal financial exposure on fairly purchased corporate notes. *Id.* Thus, a fiduciary does not need to show a potential personal financial loss in order to enforce a valid and fairly obtained contractual right that is adverse to the firm. *See In re Philadelphia & W. Ry. Co.*, 64 F.Supp. 738, 739 (E.D.Pa.1946) ("[T]he relationship has never been held to deny a director the right to purchase outstanding corporate obligations at a discount and enforce them against the company for their full amount...."); *In re McCrory Stores Corp.*, 12 F.Supp. 267, 269 (D.C.N.Y.1935) ("Under ordinary conditions a director may purchase claims against his corporation at a discount and enforce them for their full amount." (citing *Seymour v. Spring Forest Cemetery Assoc.*, 144 N.Y. 333, 39 N.E. 365 (1895) and *Glenwood Mfg. Co. v. Syme*, 109 Wis. 355, 85 N.W. 432 (1901))); *William M. Moore Const. Co. v. U.S. Fid. & Guarantee Co.*, 293 N.Y. 119, 56 N.E.2d 74 (N.Y.1944) (holding that the "purchase of the judgment against the subcontractor by an officer thereof for less than face [value] and its enforcement for its full amount is permissible"); FLETCHER CYCLOPEDIA CORPORATIONS § 869 (2006) ("[T]he general rule is that directors or other corporate officers may purchase, and enforce, claims against their corporation, at their face value, notwithstanding they were bought at a discount....").

Thus, a fiduciary may enforce validly obtained legal rights against his or her firm, even if that transaction results in a profit for the fiduciary at the firm's expense. In the present case, Clancy contracted in both the JRLP Partnership Agreement and the Op–Center Joint Venture Agreement regarding an intellectual property right, namely, control over the use and exploitation of "Tom Clancy's Op–Center." He now seeks to enforce that contracted-for-right, just as the director in *Storetrax.com* sought to enforce his contract for a severance package. The rationale for reserving such a right is obvious. Clancy is a commercially successful and highly-franchised artist. It is perfectly legitimate and rational for such an artist to seek to retain creative control over a project which bears his or her name, regardless of the degree of artistic contribution he or she actually contributes to the endeavor.[24]

The fact that Clancy validly reserved the right to control the use and exploitation of the Op–Center project does not end the inquiry. According to the terms of the JRLP Partnership Agreement and contract law generally, Clancy must exercise his discretion in good faith. Section 5.5E of the JRLP Partnership Agreement states that "[Clancy and King] shall at all times act *in good faith* and exercise due diligence in all activities relating to the conduct of the business of the Partnership."

Even if the contract did not contain this general good faith term, Maryland contract law implies such an obligation. *See* Maryland Code (1975, 2007 Repl. Vol.), Corporations & Associations Article, § 9A–103(b)(5) (noting that the partnership

---

**24.** Because Clancy is an artist who by contract retained creative control over a project which bears his name, we are hard-pressed to conceive of a contractual situation which more implicates the necessity for personal satisfaction in the contract. It is for this reason that the subjective "good faith" standard applies to Clancy's actions, instead of the objective "reasonable person" standard. *See* Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts (4th ed. 2000) §§ 38:23, 38:24 (noting the distinction between the subjective test applied to matters of personal taste, such as art, and the objective test applied to "matters of mechanical fitness, utility or marketability").

agreement may not "[e]liminate the obligation of good faith and fair dealing"); *id.* § 9A–404(d) ("A partner shall discharge the duties to the partnership and other partners under this title or under the partnership agreement and exercise any rights consistently with the obligation of good faith and fair dealing."); *Julian v. Christopher*, 320 Md. 1, 9, 575 A.2d 735, 739 (1990) (" '[T]here exists an implied covenant [in a contract] that each of the parties thereto will act in good faith and deal fairly with the others.' " (quoting *Food Fair v. Blumberg*, 234 Md. 521, 534, 200 A.2d 166, 174 (1964))); *Port E. Transfer, Inc. v. Liberty Mut. Ins. Co.*, 330 Md. 376, 385, 624 A.2d 520, 524 (1993) ("Even when the parties are silent on the issue, the law will impose an implied promise of good faith."); *Automatic Laundry Serv., Inc. v. Demas*, 216 Md. 544, 551, 141 A.2d 497, 501 (1958) (holding that a party to a contract could not, in good faith, "render valueless" the contract by "permitting . . . destructive competition"); *Chodos v. West Publ'g Co.*, 292 F.3d 992, 997 (9th Cir.2002) ("The covenant of good faith 'finds particular application in situations where one party is invested with a discretionary power affecting the rights of another.' " (quoting *Carma Developers (Cal.) v. Marathon Dev. Cal., Inc.*, 2 Cal.4th 342, 6 Cal.Rptr.2d 467, 826 P.2d 710, 726 (1992))); Gold, supra, at 126 (noting that the "contractual duty of good faith . . . is especially important" where partners have contracted away fiduciary duties).

In *Della Ratta*, 382 Md. at 558, 856 A.2d at 646, the general partner in a limited partnership announced that, as permitted in the partnership agreement, he would be requiring capital contributions from the limited partners in order pay off an outstanding loan. Several of the limited partners opposed the capital call because the general partner had not made any distributions of profits, and the capital call represented a financial hardship. *Della Ratta*, 382 Md. at 561, 856 A.2d at 647. They exercised their statutory right to withdraw from the limited partnership. The general partner responded by accelerating the due date of the capital call to antedate the withdrawal. *Della Ratta*, 382 Md. at 560, 856 A.2d at 647.

We summarized the findings of fact of the trial court in the subsequent litigation:

The Circuit Court found that "a significant motivation for Della Ratta issuing the capital call was to squeeze out some of the limited partners." The trial judge did not believe Della Ratta's testimony regarding his motivation for issuing the capital call and found Della Ratta's actions to be "completely self-serving." In addition, the Circuit Court found that Della Ratta advanced the date of the capital call in order to "out-maneuver" the Withdrawing Partners and block them from exercising their statutory right to withdraw.

*Della Ratta,* 382 Md. at 577, 856 A.2d at 657. We held that the general partner acted in bad faith. *Della Ratta,* 382 Md. at 579–80, 856 A.2d at 659.

In *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.,* 624 A.2d 1199 (Del.1993), the Supreme Court of Delaware held that a limited partner/plaintiff may maintain a claim for breach of fiduciary duty where it alleged that the general partner exercised its contractual discretion, granted in the limited partnership agreement, in bad faith. The limited partnership agreement permitted the general partner to bar the limited partners from participating in new business opportunities (leveraged buyout investments) "if the General Partner delivers a written notice to such Limited Partner that the making of such Capital Contribution or portion thereof might have a Material Adverse Effect. Any Capital Contribution by a Limited Partner might have a 'Material Adverse Effect' if: ... the General Partner, in its discretion, determines .... participation by such Limited Partner is such LBO Investment would ... have a material adverse effect on the Person that is, directly or indirectly, the subject of the proposed LBO Investment, the Partnership or Morgan Stanley." *Desert Equities,* 624 A.2d at 1202 n. 4. The general partner, exercising its rights under the partnership agreement, did not permit a limited partner to participate in three new business opportunities. *Desert Equities,* 624 A.2d at 1202. The limited partner barred from participating sued,

arguing that the exclusion by the general partner was in bad faith [25] and unreasonable. *Id.* The trial court granted the general partner's motion to dismiss for failure to state a claim. *Desert Equities,* 624 A.2d at 1203.

The Supreme Court of Delaware reversed. The court held that the limited partner may recover if it could prove that the general partner acted in retaliation against the limited partner.[26] *Desert Equities,* 624 A.2d at 1206. Thus, *Della Ratta* and *Desert Equities* stand for the proposition that where a general partner is granted discretion in the partnership agreement to act to the disadvantage of limited partners, such discretion must not be exercised in bad faith. The cases also provide a working definition of "bad faith" in the limited partnership context. A general or managing partner acts in bad faith where a primary motivation of his or her conduct is to injure either the firm/venture or his or her business partners.

The requirements of good faith in contract law are similar to the good faith doctrine in partnership law. In *First Nat. Realty Corp. v. Warren–Ehert Co.,* 247 Md. 652, 657, 233 A.2d 811, 813–14 (1967), we surveyed "a number of Maryland cases which have dealt with the question of the performance of a contract to the satisfaction of one of the parties." The Court concluded that, in "matters essentially affecting personal taste," "the purchaser's opinion as to satisfaction controlled in the absence of fraud *or bad faith." First Nat. Realty,* 247 Md. at 657, 233 A.2d at 814–15 (emphasis added); *see also*

---

25. The limited partner alleged that the general partner's decision to exclude the limited partner was in retaliation for previous litigation that the limited partner initiated against the general partner.

26. The court also held that the limited partner may recover if it proved that the general partner used its discretion to find a "materially adverse effect" in an unreasonable manner. *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.,* 624 A.2d 1199, 1206 (Del.1993). That portion of the reasoning in *Desert Equities* does not apply to the present case because neither the Op–Center Joint Venture Agreement nor the JRLP Partnership Agreement demand a factual predicate before Clancy may exercise his discretion.

SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS §§ 38:23, 38:24 (4th ed. 2000) (noting the distinction between the subjective test applied to matters of personal taste, such as art, and the objective test applied to "matters of mechanical fitness, utility or marketability"). The rule articulated in *First Nat. Realty Corp.* seems apt for application to the present case. In matters of personal discretion in contract, the party with the discretion is limited to exercising that discretion in good faith. *See also Volos, Ltd. v. Sotera*, 264 Md. 155, 171, 286 A.2d 101, 109 (1972) (holding that, in employment contracts for definite term subject to the satisfaction of the employer, the employer may discharge an employee only for an honest, good faith dissatisfaction with the employee's performance); *Wilmington Leasing, Inc. v. Parrish Leasing Co., L.P.*, Civ. A. No. 15202, 1996 WL 752364, *15, 22 Del. J. Corp. L. 1337 (Del.Ch.1996) (holding that limited partners discretion granted in the partnership agreement to remove the general partner was limited by reasonableness and good faith); *Arvida/JMB Partners, L.P. v. Vanderbilt Income & Growth Assocs.*, No. Civ. A. 15238–NC, 1997 WL 294440, *5, 23 Del. J. Corp. L. 666 (Del.Ch.1997) (holding that although a partnership agreement provision granted rights to the general partner to be exercised in its "sole and absolute discretion," such discretion must be used in good faith); *Fitzgerald v. Cantor*, No. Civ. A. 16297–NC, 1999 WL 182571, *1 (Del.Ch. 1999) ("As a matter of equity, however, a managing general partner cannot use, adversely to the interests of a partner or shareholder of a corporate partner seeking consent to transfer shares, provisions identical or similar to Section 11.01 for the sole purpose of protecting or advancing the interests of certain limited or general partners in matters unrelated to their partnership interests. Despite the fact that Section 11.01 states that the managing general partner may deny consent for any reason whatsoever, equity through an implied covenant of good faith and fair dealing demands generally that consent not be unreasonably withheld.").

If a significant motive for Clancy exercising his contractual right to withdraw his name from the Op–Center

series was to decrease the profitability of the series, thereby denying his JRLP partner and ex-wife revenue, because he desired to spite or punish King for or as a consequence of their divorce, it reasonably could be maintained that he acted in bad faith towards both the Op–Center Joint Venture and JRLP. One certainly breaches the promise of good faith owed in contract and as fiduciary in a partnership by working actively to decrease directly the profits of the business venture.[27] "Stated otherwise, under the covenant of good faith

---

27. Jerry Seinfeld, perhaps an unlikely legal illustrator, once epitomized the duty of good faith in contract. In an episode of his television show, Jerry's character purchased a jacket at a men's clothing shop. The terms of the contract permitted Jerry to return the item for refund at his discretion. When Jerry attempted to return the jacket after an unrelated personal quarrel with the salesman, the following discussion took place.

**Jerry:** Excuse me, I'd like to return this jacket.
**Clerk:** Certainly. May I ask why?
**Jerry:** For spite.
**Clerk:** Spite?
**Jerry:** That's right. I don't care for the salesman that sold it to me.
**Clerk:** I don't think you can return an item for spite.
**Jerry:** What do you mean?
**Clerk:** Well, if there was some problem with the garment. If it were unsatisfactory in some way, then we could do it for you, but I'm afraid spite doesn't fit into any of our conditions for a refund.
**Jerry:** That's ridiculous, I want to return it. What's the difference what the reason is?
**Clerk:** Let me speak with the manager ... excuse me ... Bob!
(walks over to the manager and whispers)
**Bob:** What seems to be the problem?
**Jerry:** Well, I want to return this jacket and she asked me why and I said for spite and now she won't take it back.
**Bob:** That's true. You can't return an item based purely on spite.
**Jerry:** Well, so fine then ... then I don't want it and then that's why I'm returning it.
**Bob:** Well you already said spite so....
**Jerry:** But I changed my mind.
**Bob:** No, you said spite. Too late.

*Seinfeld: The Wig Master* (NBC original television broadcast 4 April 1996).

In attempting to exercise his contractual discretion out of "spite," Jerry breached his duty to act in good faith towards the other party to the contract. Jerry would have been authorized to return the jacket if, in his good faith opinion, it did not fit or was not an attractive jacket. He may not return the jacket, however, for the sole purpose of denying to the other party the value of the contract. Jerry's post hoc rationali-

and fair dealing, a party impliedly promises to refrain from doing anything that will have the effect of injuring or frustrating the right of the other party to receive the fruits of the contract between them." *E. Shore Mkts., Inc. v. J.D. Assocs., Ltd. P'ship,* 213 F.3d 175, 184 (4th Cir.2000) (interpreting Maryland law). Thus, Clancy may not act to impair the value of the Op–Center franchise out of personal spite toward his business partner, King. Such motivation would constitute bad faith.

"Good faith ordinarily is a question of fact. . . ." *David A. Bramble, Inc. v. Thomas,* 396 Md. 443, 465, 914 A.2d 136, 149 (2007) (citing *Rite Aid Corp. v. Hagley,* 374 Md. 665, 684, 824 A.2d 107, 119 (2003)); *see Devoine Co. v. Int'l Co.,* 151 Md. 690, 696, 136 A. 37, 39 (1927) (holding that question of whether the buyer rejected tendered goods in bad faith was properly submitted to the factfinder). In the present case, the trial court made only a finding that Clancy did not act in the best interests of JRLP.[28] As noted above, Clancy only needed

---

zation that he was returning the jacket because he did not "want it" was rejected properly by Bob as not credible.

**28.** Specifically the trial court found:

> While there is evidence that Mr. Clancy wants to end the Op–Center series because sales are going down and it is hurting his literary reputation, there is proof to the contrary that the books in the "Clancy" brand are going down in sales no more than the general decline in book sales. Penguin Group USA cannot be too concerned with the expansion of the "Clancy" brand because they just agreed to add two (2) books to a new branded series: Splinter Cell, a computer game. Therefore, this Court is not persuaded that the Op–Center series is damaging Mr. Clancy in any way because there is evidence to show that the sales of the other series of books not authored by Mr. Clancy are declining as well. Further, the evidence that Mr. Clancy does not want Mrs. King to benefit in any way from the Op–Center series further supports the contention that he was not acting in the best interests of JRLP in requesting his name be withdrawn from the series and that there should not be any further publications with his name. It is this Court's opinion that Mr. Clancy breaches his fiduciary duty not only to JRLP and his partner, Mrs. King, but also to the joint venture formed for the development of the Op–Center series.

to act in good faith toward his business partners, even if such actions actually were adverse to the interests of JRLP. As there is potentially competing evidence in the record as to whether Clancy acted in good faith and/or bad faith, the judgment below shall be reversed and the case remanded for further proceedings not inconsistent with this opinion.[29]

Although it is not strictly necessary for us to comment also on the issue of attorneys' fees and expenses in light of our holding on the first question presented, we nonetheless note an analytical consideration in that regard as means to offer limited guidance to the trial court in the event it becomes appropriate to consider that subject anew on remand. *See* Maryland Rule 8–131(a). The Circuit Court previously awarded attorneys fees to King, despite the fact that the court did not determine that or how Clancy violated the parties' Marital Property Agreement. The only apparent basis for an award of attorneys' fees and expenses in these circumstances would (or could) have been a breach of the Marital Property Agreement. *See Friolo v. Frankel,* 403 Md. 443, 456, 942 A.2d 1242, 1250 (2008) ("Maryland generally adheres to the common law, or American rule, that each party to a case is responsible for the fees of its own attorneys, regardless of the outcome." (citing *Montgomery v. E. Corr. Inst.,* 377 Md. 615, 637, 835 A.2d 169, 183 (2003))); *Thomas v. Gladstone,* 386 Md. 693, 699, 874 A.2d 434, 437 (2005) ("Under the common law 'American Rule' applied in Maryland, the prevailing party in a lawsuit may not recover attorneys' fees as an element of damages or costs unless ... the parties to a contract have an agreement to that effect...."). If the Circuit Court were to find on remand that Clancy acted in bad faith, the court must resolve expressly whether the Marital Property Agreement may serve

---

Although the trial court discussed some of the evidence indicating as much, it made no discernable, reviewable finding that Clancy made the decision to withdraw his name in bad faith.

29. Given our resolution of the first question presented in Clancy's Petition for Certiorari, we shall not address his second question regarding the scope of King's authority, with regard to the Op–Center Joint Venture, were she to replace Clancy as managing partner of JRLP.

as a basis, in this litigation, to award attorneys' fees to King and, if so, how Clancy breached that agreement.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR CALVERT COUNTY AND REMAND THE CASE TO THE CIRCUIT COURT FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION; COSTS IN THE COURT OF SPECIAL APPEALS AND THIS COURT TO BE PAID BY RESPONDENT.**

BATTAGLIA, J., dissents and files opinion joined by GREENE, J.

Dissenting opinion by BATTAGLIA, J., which GREENE, J. joins.

I respectfully dissent.

In the present case, the Circuit Court for Calvert County concluded in an opinion and order that Thomas L. Clancy, Jr., Petitioner, Managing Partner of Jack Ryan Limited Partnership ("JRLP" or "the Partnership"), breached his fiduciary duty to Wanda T. King, Respondent, his ex-wife and partner in JRLP, when he attempted to withdraw his name from the "Tom Clancy's Op–Center" book series; the Op–Center series was created by Mr. Clancy and Dr. Steve Pieczenik under the auspices of the Op–Center Joint Venture between JRLP and S & R Literary, Inc. ("S & R"), a company owned by Dr. Pieczenik and his wife. As a result of Mr. Clancy's breach, the judge appointed Ms. King as Managing Partner of JRLP with respect to the Op–Center Joint Venture; subsequently, in a second order, the judge awarded Ms. King attorneys' fees and expenses. The Court of Special Appeals agreed that Mr. Clancy breached his fiduciary duty to Ms. King and JRLP, but remanded the case for clarification of the scope of Ms. King's role as Managing Partner of JRLP. The majority herein disagrees with both the trial court and the intermediate

appellate court and concludes that Mr. Clancy did not owe a fiduciary duty to Ms. King and JRLP; I dissent.[1]

Mr. Clancy and Ms. King's relationship with respect to the Partnership is governed by the JRLP Partnership Agreement, dated, February 26, 1992, Section 5.5, "Rights, Powers and Duties of Partners," of which prescribes the duties owed by the partners:

A. ... The General Partners or their Affiliated Persons may act as general or managing partners for other partnerships engaged in businesses similar to that conducted by the Partnership. Nothing herein shall limit the General Partners or their Affiliated Persons from engaging in any such business activities, or any other activities which may be competitive with the Partnership or the Property, and the General Partners or their Affiliated Persons shall not incur any obligation, fiduciary or otherwise, to disclose or offer any interest in such activities to any party hereto and shall not be deemed to have a conflict of interest because of such activities.

\* \* \*

E. The General Partners shall be under a fiduciary duty to conduct the affairs of the Partnership in the best interests of the Partnership, including the safekeeping and use of all Partnership funds and assets and the use thereof for the benefit of the Partnership. The General Partners shall at all times act in good faith and exercise due diligence in all activities relating to the conduct of the business of the Partnership.

Section 5.7 of the Partnership Agreement provides:

Neither the Partnership nor any Partner shall have any rights or obligations, by virtue of this Agreement, in or to any independent ventures of any nature or description, or the income or profits derived therefrom, in which a Partner

---

1. Because of the majority's holding, the issue regarding Ms. King's role as managing partner of JRLP is not reached, although I do agree with the Court of Special Appeals that a remand for clarification of Ms. King's role as managing partner of JRLP would be necessary.

may engage, including, without limitation, the ownership, operation, management, syndication and development of other businesses, even if in competition with the Partnership's trade or business.

The Op–Center Joint Venture is governed by the Op–Center Joint Venture Agreement, a letter agreement signed by Mr. Clancy, on behalf of JRLP, and Dr. Pieczenik, on behalf of S & R; the letter agreement contains a provision specific to Mr. Clancy and Dr. Pieczenik, which explains the process of decision-making for the Op–Center Joint Venture:

> All decisions with respect to the development, use and exploitation of the proposal shall be made by mutual agreement between Steve R. Pieczenik and Tom Clancy; provided, however, that if, after discussion, no agreement is reached, the decision of Tom Clancy shall prevail.

The bottom of the letter contained the notation, "AGREED TO (insofar as I am concerned)," and was signed by Mr. Clancy and Dr. Pieczenik individually.

The gravamen of the instant case is what fiduciary duty is owed by Mr. Clancy to Ms. King in light of the JRLP Agreement and the Op–Center Joint Venture Agreement. The majority concludes that because Mr. Clancy reserved for himself, individually, in the Op–Center Joint Venture Agreement, management and control of the Op–Center series, Mr. Clancy owed no fiduciary duty to Ms. King and JRLP, and that the pertinent inquiry is whether Mr. Clancy's actions in attempting to withdraw his name from the Op–Center series were in good faith. The issue is not whether good faith existed, however, even though Mr. Clancy did not prove his bona fides, but whether he could, for his own purposes, violate an agreement under which he had fiduciary obligations.

Professor Reed Rowley, in his treatise *Rowley on Partnership,* states that "[o]ne of the essentials or results of the partnership relation" is that a general partner "is the agent for the other partners and the partnership in partnership business," with the right to incur obligations and execute instruments on behalf of the partnership. 1 Reed Rowley,

*Rowley on Partnership* 237–38 (2d ed. 1960). *See also* 4 Alan R. Bromberg & Larry E. Ribstein, *Bromberg and Ribstein on Partnership* at Section 14.01(b) ("A general [partner] has the power to act as agent in binding the limited partnership."). The relationship of a general partner to the other partners, therefore, is "a fiduciary one, a relation of trust." *Della Ratta v. Larkin*, 382 Md. 553, 578, 856 A.2d 643, 658 (2004); *Herring v. Offutt*, 266 Md. 593, 597, 295 A.2d 876, 879 (1972); *Allen v. Steinberg*, 244 Md. 119, 128, 223 A.2d 240, 246 (1966). *See also Klein v. Weiss*, 284 Md. 36, 59, 395 A.2d 126, 139 (1978) ("The relationship between the general and limited partner is a fiduciary one—a relation of trust—similar to that existing between a corporate director and a shareholder."); J. William Callison & Maureen A. Sullivan, *Partnership Law and Practice* Section 12:1 (1996, 2004 Supp.) ("The status of partners as fiduciaries with respect to the partnership and each other is an established principle of partnership law.").

In the present case, Section 5.5E of the JRLP Partnership Agreement establishes the general fiduciary relationship owed by Mr. Clancy to Ms. King, providing that, "The General Partners **shall be under a fiduciary duty** to conduct the affairs of the Partnership in the best interests of the Partnership." (emphasis added). The fiduciary duty referred to in the JRLP Partnership Agreement has been explored by commentators, including Professor Rowley:

> The law imposes upon each partner the duty of exercising toward his copartner the utmost integrity and good faith in all partnership affairs. In transactions concerning the interests of the firm he must consider their mutual welfare, rather than his own private benefit.
>
> \* \* \*
>
> The relationship between partners being fiduciary, the highest degree of good faith between the partners is required. "There can be no question but that the law holds each member of a partnership to the highest degree of good faith in his dealings with reference to any matter which concerns the business of the common engagement, and that each partner, being the agent of the firm, must be held, during

the existence of the relation, to the same accountability as other trustees, in all matters which affect the common interest." "There is no stronger fiduciary relation known to the law than that of a copartnership, where one man's property and property rights are subject to a large extent to the control and administration of another."

1 Rowley, *Rowley on Partnerships* at 516–17 (footnotes omitted). *See also* 2 Bromberg & Ribstein, *Bromberg and Ribstein on Partnership* at Section 6.07 (stating that generally, "partners owe fiduciary duties to each other and to the partnership"); Callison & Sullivan *Partnership Law and Practice* at Section 12:1 ("The status of partners as fiduciaries with respect to the partnership and each other is an established principle of partnership law."). In *Della Ratta*, 382 Md. at 578, 856 A.2d at 658, we had occasion to explore the fiduciary duty of general partners:

The partnership relationship is a fiduciary one, a relation of trust. *Allen v. Steinberg*, 244 Md. 119, 128, 223 A.2d 240, 246 (1966). Managing or general partners particularly owe a fiduciary duty to inactive partners. *Id.* Moreover, the partnership relationship carries with it the requirement of utmost good faith and loyalty. *Herring v. Offutt*, 266 Md. 593, 597, 295 A.2d 876, 879 (1972). As Justice Cardozo, then Chief Judge of the New York Court of Appeals, stated:

"Many forms of conduct permissible in a workaday world for those acting at arm's length are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions.... Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd."

*Meinhard v. Salmon,* 249 N.Y. 458, 164 N.E. 545 (1928) (quoted in *Herring,* 266 Md. at 597, 295 A.2d at 879).

Clearly, under the JRLP Partnership Agreement, General Partners of JRLP, Mr. Clancy and Ms. King, owed each other a fiduciary duty to conduct the affairs of the Partnership, including the Op–Center Joint Venture, in the best interests of the Partnership. The fact that under the Partnership Agreement Mr. Clancy and Ms. King could each pursue independent business ventures similar to, or even in competition with, the business conducted by the Partnership, does not change this basic tenet of partnership law, which Mr. Clancy and Ms. King adopted in the JRLP Agreement.

The majority circumvents the fiduciary duty owed by Mr. Clancy to Ms. King by referencing the Op–Center Joint Venture Agreement, which includes a provision specific to Mr. Clancy and Dr. Pieczenik explaining that, essentially, Mr. Clancy reserved for himself, individually, management and control of the Op–Center series. That clause, which pertains only to that agreement, however, does not eviscerate the fiduciary duty owed to Ms. King and JRLP under a different agreement. As both the trial court and the Court of Special Appeals recognized, even though Mr. Clancy reserved to himself, individually, in the Joint Venture Agreement, the management and control of the development, use and exploitation of the book series, that agreement was signed by Mr. Clancy as general partner of JRLP. The trial court concluded that "as an agent of the partnership, [and] also as managing partner, Mr. Clancy has the duty to act in the best interests of JRLP by informing Ms. King of any matters that are to the benefit or detriment of JRLP and any related projects":

It is clear that Mr. Clancy no longer wanted to be associated with the Op–Center series, but there is evidence that indicates that he had no problem continuing with the other products in the Clancy line.

* * *

Mr. Clancy was aware that not only was the Op–Center series declining in sales, but also the sales in the other

products in the Clancy brand. There is nothing to indicate that he wished to prevent the use of his name on the other Clancy brand products, even those books he does not personally author.

Tom Clancy is a name synonymous with the techno-thriller genre and because Mr. Clancy's name is significant in the publishing world and carries such a name brand recognition, it would have been damaging to the partnership and the joint venture to have had his name removed from the Op–Center series. The purpose of the partnership and the joint venture would become frustrated for the reasons that the parties would not be able to contract, obtain the dollar values for the books and enjoy the fan base it enjoys now.

\* \* \*

In the case at bar, even though Dr. Pieczenik and Mr. Clancy reserved to themselves, each individually, the management and control over the Op–Center series, Mr. Clancy signed the agreement on behalf of JRLP to carry out the business of JRLP which is to pursue activities relating to writing and the sale of books. Not only was the agreement made in the usual course of the partnership business, it was prepared by the attorney for JRLP and signed by the managing partner of JRLP, with the partnership name on the agreement.

\* \* \*

While there is evidence that Mr. Clancy wants to end the Op–Center series because sales are going down and it is hurting his literary reputation, there is proof to the contrary that the books in the "Clancy" brand are going down in sales no more than the general decline in book sales. Penguin Group USA cannot be too concerned with the expansion of the "Clancy" brand because they just agreed to add two (2) books to a new branded series: Splinter Cell, a computer game. Therefore, this Court is not persuaded that the Op–Center series is damaging Mr. Clancy in any way because there is evidence to show that the sales of the other series of books not authored by Mr. Clancy are declining as well. Further, the evidence that Mr. Clancy

does not want Mrs. King to benefit in any way from the Op–Center series further supports the contention that he was not acting in the best interest of JRLP in requesting his name be withdrawn from the series and that there should not be any further publications with his name. It is this Court's opinion that Mr. Clancy breached his fiduciary duty not only to JRLP and his partner, Mrs. King, but also to the joint venture formed for the development of the Op–Center series.

The Court of Special Appeals agreed and noted that although it "is possible that [Mr. Clancy] could have withdrawn permission to use his name without breaching a duty to the Op–Center Joint Venture," Ms. King's "complaint, however, raised the issue of whether appellant had breached his fiduciary duty to Ms. King and JRLP, not to the Op–Center Joint Venture":

Tom Clancy's Op–Center is an asset of JRLP. The evidence before the circuit court leads to the reasonable conclusion that any acts that diminish the sales of Op–Center products, and thus income, will adversely effect the income of its co-owners—JRLP and S & R. Thus, our inquiry is whether appellant upheld his ... contractually imposed (JRLP limited partnership agreement) fiduciary duties to JRLP and appellee to protect and exploit the Op–Center asset.

\* \* \*

We find no error in the court's legal rulings that appellant was subject to a fiduciary duty, and that duty was not superceded by the partnership agreements.

\* \* \*

We, therefore, affirm the circuit court's conclusion that appellant breached his fiduciary duty to appellee and JRLP.

In the case *sub judice*, there are two extant partnership agreements which the majority, apparently, conflates, although Ms. King was not a signatory to the Op–Center Joint Venture Agreement but only the JRLP Agreement. The JRLP Agreement predated that Joint Venture Agreement, which was executed by Mr. Clancy, Managing Partner of JRLP, on the Partnership's behalf, to carry out its business,

i.e., to pursue activities relating to the writing, publishing, and sale of books. Thus, Ms. King could not have adopted the Op–Center Joint Venture Agreement's individual terms as part of the Partnership Agreement, but Mr. Clancy, acting on behalf of JRLP with the Op–Center Joint Venture, was bound by the fiduciary duty specified in the JRLP Agreement.

Moreover, the majority errs in stating that because Clancy could control the management of the Op–Center Joint Venture, "[t]here is no reason ... that he could not contract for less of an interest in the Op–Center activities for himself individually," and "[t]hus, the terms of the Op–Center Joint Venture contract were permitted by the terms of the JRLP Partnership Agreement." Majority op. at 562, 954 A.2d at 1104. By attempting to remove his name from the Op–Center series, consequently, Mr. Clancy also was adversely affecting Ms. King's interest in the book series, to whom he owed a fiduciary duty, although Ms. King did not authorize such an action.

Nevertheless, the majority cites to our decision in *Storetrax. com, Inc. v. Gurland,* 397 Md. 37, 915 A.2d 991 (2007), as well as to *Waterfall Farm Systems, Inc. v. Craig,* 914 F.Supp. 1213 (D.Md.1995), for the proposition that an individual occupying a fiduciary relationship with a corporation or partnership may properly obtain and enforce legal rights against the corporation or partnership without breaching the fiduciary duty. That reading, however, extends the reach of those two cases beyond the realm of what was presented.

In *Waterfall Farm Systems,* 914 F.Supp. at 1213, two corporate directors sought to terminate a lease with the corporation; the corporation objected and filed suit. Judge Alexander Harvey, II of the United States District Court for the District of Maryland noted that the director's "interest were adverse to those of the Corporation, and that they had every right to take proper and lawful steps to protect the substantial investment which they had in the real property owned by them," and "the mere fact that the Craigs were officers and directors of Waterfall did not impose on them a legal obligation to accede to demands of the Corporation

*which were adverse to their personal financial interest."* 914 F.Supp. at 1228 (emphasis added). Thus, proof would be required of adverse effect on personal financial interests, which was not provided by Mr. Clancy.

We found Judge Harvey's reasoning persuasive in *Storetrax.com*, 397 Md. at 37, 915 A.2d at 991, where a member of the board of directors of a corporation, and a former employee, brought a lawsuit against the corporation to recover severance pay due him and to enforce a garnishment order against the corporation. We concluded that the director did not breach his fiduciary duty because the director could maintain a cause of action against the corporation and "had no legal obligation to accede to the demands of [the corporation] to relinquish a judgment to which he then had a colarable right merely because the corporation asked him to do so." *Id.* at 69, 915 A.2d at 1010.[2] Again, adverse effect was required.

In the present case, the Circuit Court, however, found as a matter of fact, uncontested before us, that Mr. Clancy had not proven that the use of his name in the Op–Center book series was adverse to his personal interests:

> Tom Clancy is a name synonymous with the techno-thriller genre and because Mr. Clancy's name is significant in the publishing world and carries such a name brand recognition, it would have been damaging to the partnership and the joint venture to have had his name removed from the Op–Center series. The purpose of the partnership and the joint venture would become frustrated for the reasons that the

---

2. The majority also cites *Manufacturers Trust Co. v. Becker*, 338 U.S. 304, 70 S.Ct. 127, 94 L.Ed. 107 (1949), for the proposition that an individual occupying a fiduciary relationship with a corporation may ordinarily purchase debt of the corporation at a discount and recover face value. *Manufacturers Trust*, however, did not involve a breach of fiduciary duty claim, as the Supreme Court noted that "Petitioner does not here contend that respondent's claims should be limited because of conduct by the Becker directors or by respondents amounting to bad faith or abuse of fiduciary advantage." *Id.* at 309, 70 S.Ct. at 130, 94 L.Ed. at 113. Even so, in that case the fiduciary proved that acceding to the demands of the corporation would have constituted an adverse effect on his personal financial interests.

parties would not be able to contract, obtain the dollar values for the books and enjoy the fan base it enjoys now.

\* \* \*

While there is evidence that Mr. Clancy wants to end the Op–Center series because sales are going down and it is hurting his literary reputation, there is proof to the contrary that the books in the "Clancy" brand are going down in sales no more than the general decline in book sales. Penguin Group USA cannot be too concerned with the expansion of the "Clancy" brand because they just agreed to add two (2) books to a new branded series: Splinter Cell, a computer game. Therefore, this Court is not persuaded that the Op–Center series is damaging Mr. Clancy in any way because there is evidence to show that the sales of the other series of books not authored by Mr. Clancy are declining as well. Further, the evidence that Mr. Clancy does not want Mrs. King to benefit in any way from the Op–Center series further supports the contention that he was not acting in the best interest of JRLP in requesting his name be withdrawn from the series and that there should not be any further publications with the name.

JRLP's interests, the court found, were not adverse to those of Mr. Clancy, and therefore, Mr. Clancy was not relieved of his fiduciary duty to Ms. King and JRLP. The Court of Special Appeals agreed when it noted,

Most significant on the question of whether a glut of Op–Center books was damaging to the sales and income, of Tom Clancy's books, was testimony of David Shanks, the Chief Executive Officer of Penguin Books, the publisher of Tom Clancy's books. From Shanks's wide-ranging testimony the court was able to conclude that the Op–Center brand was not a significant cause of decreasing Tom Clancy sales.

\* \* \*

Pieczenik testified as to his disagreements with Clancy about the future of Op–Center and concluded that the proposal to withdraw the Clancy name from the Op–Center brand was not put forward until Clancy and King began their divorce proceedings. He opined that Clancy, together

with his literary agent, undertook to subvert the Op–Center products. There existed throughout the trial the undercurrent that Clancy's motive in withdrawing his name from the Op–Center venture, and effectively crippling it, was to harm the financial interests of King.

Moreover, what Mr. Clancy, and the majority, fail to recognize is that Mr. Clancy's interests in the Op–Center book series, in fact, are consistent with those of Ms. King and JRLP. As JRLP partners, Mr. Clancy and Ms. King owned rights to several of Mr. Clancy's literary works, in addition to the Op–Center series, including "Without Remorse," "Debt of Honor," "Executive Orders," and "Rainbow Six." Had Mr. Clancy proven that the decline in sales in the Op–Center series had had a negative affect on the "Tom Clancy" brand, including the other works under the purview of JRLP, he could have acted within his fiduciary obligation, in his, Ms. King's *and* JRLP's interests, should he have attempted to withdraw his name from the book series. I agree with the Circuit Court and the Court of Special Appeals, however, that Mr. Clancy did not prove adverse effect. To say absent adverse effect, that a general partner can withdraw an asset vital to the Partnership without breach, not only offends the terms of the JRLP Partnership Agreement,[3] but, offends the notion of fiduciary duty.

I dissent.[4]

---

**3.** Section 5.3 of the JRLP Agreement states:

*Restrictions on Authority*

A. With respect to the Partnership and the Property, the General Partners shall not have any authority to perform any act in violation of any applicable laws or regulations thereunder, nor shall any General Partner as such, without the Consent of the Limited Partners, have any authority:

(i) to do any act in contravention of this Agreement.

(ii) to do any act which would make it impossible to carry on the ordinary business of the Partnership; or

(iii) to possess Partnership property, or assign its rights in specific Partnership property, for other than a Partnership purpose.

**4.** Mr. Clancy's and Ms. King's divorce was finalized on January 6, 1999. "Incorporated but not merged" into the divorce decree was a Marital

Judge GREENE authorizes me to state that he joins in this dissenting opinion.

Property Agreement, which did not alter the ownership of the interests of Mr. Clancy and Ms. King in JRLP, but appointed Mr. Clancy as the Partnership's Managing Partner. The Marital Property Agreement also contained a provision which stated that "[e]ach party shall indemnify and hold the other harmless from all damages, liabilities, losses, costs, fees and expenses (including attorneys and accountants fees and expenses) resulting from such party's breach of this Agreement." I agree with the majority in that the only basis for the trial court's award of attorney's fees to Ms. King was a finding that Mr. Clancy breached the Marital Property Agreement, and that the Circuit Court, if confronted with the same motion on remand, should resolve expressly whether the Marital Property Agreement was breached.